Robert E. NEIMES, M.D., Garry Woo, M.D., Individually and in Their Official Capacities, Texas Center for Infectious Disease, San Antonio State Chest Hospital, and Texas Department of Health, Appellants

v.

Kien Chung TA & Stephen Fisher, Appellees

No. 04–97–00916–CV.

Court of Appeals of Texas, San Antonio.

Nov. 25, 1998.

Rehearing Overruled Jan. 11, 1999.

Laurie Rayson Eiserloh, Assistant Attorney General, Austin, for Appellant.

James C. Harrington, Peter Hofer, Austin, for Appellee.

Before CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice and KAREN ANGELINI, Justice.

KAREN ANGELINI, Justice.

Appellants, Robert E. Neimes, M.D., Garry Woo, Texas Center for Infectious Disease, San Antonio State Chest Hospital, and Texas Department of Health, appeal an order denying their motion for summary judgment on the issues of qualified and official immunity. We affirm in part and reverse in part the judgment of the trial court.

FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to court orders, Kien Chung Ta and Stephen Fisher were both quarantined at the Center for Infectious Disease Control[1] (the Center) in San Antonio, Texas. Ta and Fisher were quarantined because they had contagious forms of tuberculosis, but refused to take their tuberculosis medications. Dr. Robert E. Neimes was the supervisor of the Center during the time Ta and Fisher were quarantined, and Dr. Garry Woo was their treating physician.

During Ta's and Fisher's quarantine at the Center, the Center's policy was to confine all involuntary quarantine patients to solitary confinement in order to prevent the exposure of visitors and patients who had voluntarily come to the Center for treatment. This confinement meant the quarantined patients were completely restricted to their rooms, with the exception of two one-hour exercise breaks per day.

A. Kien Chung Ta

Before Ta was quarantined at the Center, the Texas Department of Health made numerous attempts to persuade Ta to take his tuberculosis medication. However, he consistently refused to cooperate and became extremely ill. He became uncontrollable when admitted into a Houston hospital and left against medical advice. Because he had become a threat to public health and to himself, a Houston court entered an order quarantining Ta to the Center in San Antonio[2] until he was cured. Ta resided at the Center from August, 1992, to September, 1994.

Ta spoke English poorly, but was fluent in both Vietnamese and Chinese. The Center never provided Ta with an interpreter. Hospital staff felt Ta could speak enough English to make his needs known; however, both Dr. Neimes and Dr. Woo requested that Ta's family and members of the local Asian community visit with Ta and stress the need for him to take his medication. Nevertheless, Ta continued to refuse to take his medication while at the Center. Within a month of confinement, Ta began to exhibit signs of mental illness, such as dismantling his furniture and using it as a weapon, starting fires, and relieving himself on the floor. Out of concern for Ta's safety and the safety of hospital staff, the Center removed all of Ta's furniture except his mattress.

Because Ta would not take his medication, Dr. Woo requested at least two psychiatric consults. The psychiatrist recommended that Ta be prescribed Prolixin, an anti-psychotic drug. When Ta refused to be medicated, Dr.Woo administered the Prolixin by dissolving the drug into Ta's orange juice without Ta's knowledge. After several months of Prolixin therapy, Ta began to calm down and take his tuberculosis medication. However, after a year of taking Prolixin, Ta

1. The Center for Infectious Disease Control is a component of the Texas Department of Health and was formerly known as the San Antonio Chest Hospital.

2. The Center is the only quarantine facility in Texas.

developed tardive dyskensia, a well-known side-effect of Prolixin that causes involuntary muscle spasms. Consequently, Dr.Woo discontinued the Prolixin, and Ta again refused to take his tuberculosis medication. His tuberculosis worsened, and following another psychiatric consult, the psychiatrist recommended that Ta be given a different antipsychotic drug, Haldol.

Because of the type of tuberculosis Ta was infected with, he required eighteen months of continuous treatment in order to ensure complete remission. Because he refused to consistently take his medication for the first seven months of his quarantine, Dr. Neimes and Dr. Woo felt that Ta needed to be treated for an additional year from the time the original court order expired. Ta was, therefore, detained at the hospital for four days between the expiration of his first commitment order and the issuance of his second commitment order. Neither Dr. Neimes nor Dr. Woo informed Ta that his commitment order had expired during those four days. Ta completed his treatment in September, 1994, and was released. Ta died January 2, 1998.

### B.  Stephen Fisher

Fisher was diagnosed with tuberculosis in June of 1993. He had a history of alcoholism and acknowledged that he could not be depended on to take his tuberculosis medication. Accordingly, the Orange County Health and Welfare Center recommended that Fisher be quarantined until his tuberculosis was no longer a threat to himself or the public. Fisher voluntarily agreed to court-ordered quarantine, and was quarantined at the Center from July, 1993, to February, 1994.

When Fisher was admitted, Dr. Woo was aware of his history of alcoholism and depression. He arranged for Fisher to be seen by a licensed chemical dependency counselor throughout his stay at the Center. During the first few months of his quarantine, Fisher exhibited numerous behavioral problems. Noticing signs that Fisher was depressed, Dr. Woo requested a psychiatric consult in November, 1993. Based on the psychiatrist's recommendation, Fisher was treated for de-

pression. Fisher was eventually cured of his tuberculosis and now lives in Orange, Texas.

### C.  The Lawsuit

Ta and Fisher sued appellants for negligence and false imprisonment, violations of their federal and state constitutional rights, and violations of the Texas Health and Safety Code. Ta also sued for battery. On October 24, 1997, the trial court granted, in part, and denied, in part, the defendants' motion for summary judgment. The Department of Health and the Center were granted summary judgment for violations of the Americans with Disabilities Act (ADA) and the Texas Constitution and for the intentional torts. The trial court granted Dr. Neimes and Dr. Woo summary judgment for violations under the ADA and the Rehabilitation Act as well as violations of the Texas Constitution. The trial court denied summary judgment on the issues of federal qualified immunity and state official immunity, and all other issues not specifically granted. This appeal is based on the denial of summary judgment on the issues of qualified and official immunity. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(5) (Vernon Supp.1998) (authorizing appeal from interlocutory order denying motion for summary judgment based on assertion of immunity).

### ARGUMENT AND AUTHORITY

### A.  Summary Judgment Response

■ Contrary to Ta's and Fisher's assertion, "the factual allegations in [their] petition and pleadings are" not "sufficiently detailed and specific ... to withstand any claim of immunity by [a]ppellants, even if [we] were not to consider [their] response or supporting expert affidavit...." This is necessarily true because the factual allegations in pleadings are not summary judgment evidence, regardless of their level of detail, even if they are verified. *See Laidlaw Waste Systems (Dallas), Inc. v. City of Wilmer,* 904 S.W.2d 656, 660 (Tex.1995). Consequently, in reviewing the trial court's order, we must determine what summary judgment evidence was before the trial court. Therefore we begin our analysis with the appellants' third

issue, in which they contend Ta's and Fisher's response is a nullity because it was filed late without the trial court's permission.

■ A response to a motion for summary judgment, including opposing summary judgment evidence, may be filed no later than the seventh day before the date of the hearing "[e]xcept on leave of court." TEX.R. CIV. P. 166a(c); *see Sosa v. Central Power & Light,* 909 S.W.2d 893, 895 (Tex.1995) (noting because TEX.R. CIV. P. 4 applies to all time periods in the Texas Rules of Civil Procedure, the date a pleading is filed is excluded, and the date of the hearing is included as the seventh day). Thus, Rule 166a(c) "specifically places the burden on the [respondent] to obtain leave of court to file a late response." TIMOTHY PATTON, SUMMARY JUDGMENTS IN TEXAS § 2.02[2] (Michie 1996).

■ Permission to file a response late may be reflected in "a separate order," "a recital in the summary judgment," or an oral ruling contained in the reporter's record of the summary judgment hearing. *Id.* In any event, the record must contain "an affirmative indication ... that the trial court permitted the late filing of the response;" otherwise, as "Texas courts have repeatedly confirmed," the "response is a nullity." *Id.* Accordingly, if the record contains nothing indicating the trial court considered a late-filed response, we must presume the trial court did not consider it and we must do likewise. *See Benchmark Bank v. Crowder,* 919 S.W.2d 657, 663 (Tex.1996); *Goswami v. Metropolitan Sav. and Loan Ass'n,* 751 S.W.2d 487, 491 (Tex.1988); *INA of Texas v. Bryant,* 686 S.W.2d 614, 615 (Tex.1985).

Ta and Fisher concede that they did not file their response by the seventh day before the date of the summary judgment hearing. They also concede that the record does not contain a written order indicating the trial court granted them permission to file their response late. Nor is permission reflected in the trial court's summary judgment order, which states that the trial court considered "the motion and attached summary judgment evidence," or in the reporter's record of the summary judgment hearing, which we attempted to obtain but were told is unavailable. We must, therefore, presume the trial court did not consider Ta's and Fisher's response unless, as they contend, the appellants "waived error on this issue," the record indicates the trial court considered their late-filed response, or their response was timely filed in light of the originally scheduled hearing date.

### 1. Waiver by Failing to Object

■ Ta and Fisher first argue the appellants were required to object to their response as untimely filed and, by failing to do so, "waived error on the issue of timeliness. ...." We disagree.

The Texas Supreme Court has mandated that we presume the trial court did not consider a late-filed response unless something in the record indicates it did. *Benchmark Bank,* 919 S.W.2d at 663; *Goswami,* 751 S.W.2d at 491; *Bryant,* 686 S.W.2d at 615. Accordingly, whether the record contains the requisite "something" is dispositive. Because this factor, standing alone, is dispositive, no other factor—including whether a movant objects—is or can be material. *See Luna v. Estate of Rodriguez,* 906 S.W.2d 576, 582 (Tex.App.—Austin 1995, no writ) ("If the movant files late summary judgment evidence and no order appears in the record granting leave to file, we presume the trial court did not consider the evidence *regardless of whether the nonmovant failed to object to the evidence.*") (emphasis added). Simple logic thus compels the conclusion, and we hold, that appellants were not required to object to Ta's and Fisher's response as untimely filed. To hold otherwise, as the dissent advocates, would be logically inconsistent with the burden expressly placed on summary judgment respondents by the Supreme Court of Texas in Rule 166a(c) and with the presumption the court has mandated by its interpretation of the rule. We therefore conclude that the Fifth Court of Appeals was plainly wrong in considering the late-filed summary judgment evidence because the movant did not file a motion to strike it. *City of Coppell v. General Homes Corp.,* 763 S.W.2d 448, 454 (Tex.App.—Dallas 1988, writ denied). As a result, we believe the dissent's reliance on *City of Coppell* is misplaced.

To support their argument to the contrary, Ta and Fisher mistakenly rely on *Davis v. Davis,* 734 S.W.2d 707 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), in which the First Court of Appeals held "an allegation that a party received less notice than required by statute does not present a jurisdictional question and therefore may not be raised for the first time on appeal." *Id.* at 712. We have no quarrel with this holding, which simply reflects a correct application of the rule that "[i]ssues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX.R. CIV. P. 166a(c). But this rule has no application here. The burden to raise the timeliness issue was expressly placed on Ta and Fisher by Rule 166a(c). Accordingly, if they wished to have their late-filed response considered, they were required to obtain the trial court's permission to file it late. *See* TEX.R. CIV. P. 166a(c). Because the burden of raising the timeliness issue was expressly imposed on Ta and Fisher, simple logic precludes imposing the same burden on the appellants.

### 2. "Something in the Record"

Ta and Fisher next argue that the trial court's rulings on the appellants' objections to their late-filed summary judgment evidence indicate the trial court considered their late response. However, Ta and Fisher have not supplied this court with any authority to support their argument, and we have found none in our own research. Nevertheless, we are not without guidance. As stated by one of the original drafters of the rules of procedure, Chief Justice Alexander:

> The object of the new rules is "to obtain a just, fair, equitable and impartial adjudication of the rights of litigants," Rule 1, and where this can be done without doing violence to the rules or injustice to the rights of the parties, it is the duty of the court do so....

*Smirl v. Globe Laboratories,* 144 Tex. 41, 188 S.W.2d 676, 678 (Tex.1945) (quoting TEX.R. CIV. P. 1). Therefore, we must determine whether the holding that Ta and Fisher advocate would serve the objective of "obtain[ing] a just, fair, equitable and impartial

adjudication ... without doing violence to the rules or injustice to the rights of the parties...." *Id.*

The burden placed on respondents, in Rule 166a(c), to obtain the trial court's permission to file their response late is relatively light and not inconsistent with any other rule. But if we were to hold that this burden is satisfied by the trial court's rulings on a movant's objections to late-filed summary judgment evidence, we would impose an impossible burden on movants, both practically and theoretically.

As a practical matter, Ta and Fisher argue that the trial court would not have ruled on the appellants' objections unless it considered their late-filed response. But the reality of litigation compels the opposite conclusion. A litigant in a summary judgment proceeding must file its objections to summary judgment evidence, and obtain rulings on these objections, to preserve its right to complain on appeal about defects of form in its opponent's summary judgment evidence. *See, e.g., Nebgen v. Minnesota Mining & Mfg. Co.,* 898 S.W.2d 363, 367 (Tex.App.—San Antonio 1995, writ denied). And no one can know with certainty whether or when a response thought to be filed late might be considered by a trial or appellate court. *Cf., e.g., Sosa,* 909 S.W.2d at 895 (holding amended petition was timely filed on the sixth, rather than seventh, day before the date of the hearing under TEX.R. CIV. P. 4 and overruling contrary authority). Consequently, even if it appears the trial judge will not consider a late-filed response, a reasonable trial judge will rule on objections to summary judgment evidence, and prudent attorneys will insist they do so, to ensure the objections are preserved in the event the late-filed response is considered at some later stage in the proceeding. Therefore, as a practical matter, we cannot infer a trial judge considered a late-filed response merely because it ruled on a party's objections to summary judgment evidence. Nor can we do so theoretically.

The burden of obtaining rulings to preserve objections and the burden of obtaining the trial court's permission to file a response late dictate corresponding rights. Specifically, a party has the right to insist its opponent

waived its objections to summary judgment evidence by failing to obtain rulings, while a summary judgment movant has the right to insist the respondent waived consideration of a response by failing to obtain the trial court's permission to file it late. Accordingly, if we were to hold a trial court's rulings on a party's objections constitute the requisite "something in the record" indicating that the trial court considered a late-filed response, we would implicitly hold that a summary judgment movant must waive its right to complain on appeal about defects of form in the respondent's summary judgment evidence to preserve its right to insist the respondent meet its burden of obtaining the trial court's permission to file a response late. In short, if we adopted Ta's and Fisher's argument, as the dissent advocates, we would force summary judgment movants to waive one right to preserve another.

Placing summary judgment movants in this "catch–22" would clearly not accomplish the objective of "obtain[ing] a just, fair, equitable and impartial" adjudication without "doing violence to the rules or injustice to the rights of the parties...." We therefore reject Ta's and Fisher's argument and instead hold that a trial court's rulings on a movant's objections to late-filed summary judgment evidence do not indicate the trial court considered a late-filed response.

### · 3. Timeliness in Light of Original Hearing Date

■ Finally, Ta and Fisher argue their response should be considered timely filed on October 24 because the appellants waited to file their motion for summary judgment until two years after suit was filed and because the hearing was originally scheduled for October 30, but was reset at Ta's and Fisher's request and with the appellants' agreement to ensure the November 10 trial setting. We disagree.

Rule 166a(b) expressly permits a defendant to file a motion for summary judgment "at any time," and Rule 166a(c) expressly requires a respondent to file its response no later than the seventh day before the summary judgment hearing or obtain leave of court. TEX.R. CIV. P. 166a(b), 166a(c); *cf.* TEX.R. CIV. P. 166 (providing for pretrial

conferences and orders). Because the response deadline is tied to the date of the summary judgment hearing, a later hearing date results in a later response deadline. *See Allen v. Roddis Lumber & Veneer Co.,* 796 S.W.2d 758, 761 (Tex.App.—Corpus Christi 1990, writ denied). By the same token, an earlier hearing date results in an earlier response deadline. In either event, it is the respondent's responsibility to determine whether it has received the requisite twenty-one days notice of a summary judgment hearing and, if not, object in its response or move for a continuance. *See* TEX.R. CIV. P. 166a(c). It is also the respondent's responsibility to determine the date its response is due and, if it is unable to meet this deadline, obtain the trial court's permission to file a response late. *See* TEX.R. CIV. P.166a(c), 166a(g). Because these burdens were expressly imposed on Ta and Fisher by Rule 166a, we will not shift them—or the consequences of Ta's and Fisher's failure to meet them—to the appellants.

■ In sum, Ta's and Fisher's response was filed late, and the record does not contain a reporter's record of the summary judgment hearing or a written order indicating the trial court granted them permission to file their response late. Nor does any other document in the record, including the trial court's rulings on the appellants' objections to Ta's and Fisher's late-filed summary judgment evidence, indicate the trial court considered their late-filed response. Therefore, we must presume the trial court did not consider either Ta's and Fisher's response or their summary judgment evidence, and we must do likewise. In light of our decision on this issue, it is unnecessary to address the appellants' argument regarding the trial court error in overruling appellants' objections to Ta's and Fisher's summary judgment response.

■ The absence of a response does not mandate an affirmance, however. To the contrary, regardless of whether Ta and Fisher filed a response, the appellants bear the burden of demonstrating there is no genuine issue of material fact regarding their affirmative defense of immunity and that they are

entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *see City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979). We must, therefore, consider the legal sufficiency of the appellants' motion for summary judgment and supporting evidence.

## B. Federal Qualified Immunity

In their first point of error, appellants argue that the trial court erred when it denied the appellants' motion for summary judgment based on Dr. Neimes' and Dr. Woo's affirmative defense of qualified immunity because the constitutional rights that Ta and Fisher have asserted are not clearly established. Appellants argue, in the alternative, that if the constitutional rights are clearly established, Dr. Neimes and Dr. Woo did not violate those rights because they exercised professional judgment in their dealings with Ta and Fisher.

■ Under the doctrine of qualified immunity, as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would be aware, government officials performing discretionary functions are generally shielded from liability or civil damages under federal law. *Harlow v. Fitzgerald,* 457 U.S. 800, 817–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The purpose of this doctrine is to protect public officials from undue interference with their duties and from potentially disabling threats of liability. *Id.* at 818, 102 S.Ct. 2727.

■ To preclude the application of qualified immunity, the right asserted must be established at the time of the alleged violation. *Elder v. Holloway,* 510 U.S. 510, 514–16, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). If the parameters of the asserted right are not so clear that a reasonable official would understand that what he is doing violates that right, then qualified immunity will be found. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Accordingly, whether an official can be held liable for taking an allegedly unlawful action turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were clearly established at the time the action was taken. *See id. at* 639, 107 S.Ct. 3034. Consequently, qualified immunity is a powerful shield that will protect "all but the plainly incompetent or those who knowingly violate the law." *Emerson v. Borland,* 927 S.W.2d 709, 719 (Tex.App.— Austin 1996, writ denied), *cert. denied,* ── U.S. ──, 118 S.Ct. 174, 139 L.Ed.2d 116 (1997).

### 1. Cruel and Unusual Punishment

■ We first address Ta's and Fisher's claim of cruel and unusual punishment. The Eighth Amendment prohibition against cruel and unusual punishment was designed to protect those convicted of crimes. *Ingraham v. Wright,* 430 U.S. 651, 664, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *see Powell v. Texas,* 392 U.S. 514, 531–32, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). There is no clearly established right to be free from cruel and unusual punishment in the context of an involuntary quarantine situation. In fact, the Supreme Court explicitly declined to consider "whether or under what circumstances persons involuntarily confined in mental or juvenile institutions can claim the protections of the Eighth Amendment." *Ingraham,* 430 U.S. at 669, 97 S.Ct. 1401. Because there was no clearly established standard applying the Eighth Amendment to civil situations at the time Ta and Fisher were quarantined, Dr. Neimes and Dr. Woo are entitled to qualified immunity from Ta's and Fisher's cruel and unusual punishment claims.

### 2. Right to Reasonably Safe Conditions and Freedom from Unreasonable Restraint

Ta and Fisher also claim that their constitutional rights to reasonably safe conditions, bodily integrity, and freedom from unreasonable restraint were violated by the conditions under which they were confined at the Center. In doing so, Ta and Fisher rely on *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Appellants argue that the rights Ta and Fisher assert are not so clearly established that they defeat Dr. Neimes' and Dr. Woo's claim of immunity because the facts in *Youngberg* are not analogous enough to the facts in this case to clearly establish the standard by which the

doctors' conduct should be judged. Appellants argue that patients involuntarily quarantined for the protection of the public are not analogous to mentally disabled patients such as Youngberg, who was involuntarily committed and restrained in order to protect himself.

We do not read *Youngberg* so narrowly. While the facts in *Youngberg* involved a mentally disabled patient who was committed for his own safety, the Court did not limit the rights it discussed to such circumstances. Instead, the Court noted the well-established rights to personal security and liberty from bodily restraint, and then, confirmed that those rights survive involuntary civil commitment. *See Youngberg*, 457 U.S. at 315–16, 102 S.Ct. 2452. However, the Court did not declare that those rights are limitless in involuntary commitment situations. *See id.* at 319–20, 102 S.Ct. 2452.

In such situations, the State has considerable discretion in determining the nature and scope of its responsibilities. *Id.* at 317, 102 S.Ct. 2452. The State may only restrain those committed when and to the extent that professional judgment deems restraint necessary to ensure that the residents and staff are reasonably safe. *Id.* at 324, 102 S.Ct.2452. However, professional judgment is presumed valid as long as there is no substantial departure from accepted professional standards. *Id.* at 323, 102 S.Ct. 2452. Further, immunity bars liability where a State employee is unable to satisfy normal professional standards because of budgetary constraints. *Id.*

In his affidavit, Dr. Neimes states that he used professional judgment when he formed the policy of confining quarantined tuberculosis patients to their rooms. Dr. Neimes explains that there was only one ward available for the long-term treatment of tuberculosis patients. Most patients who lived on the ward were not under court-ordered quarantine, so Dr. Neimes did not feel that it was appropriate to lock the door of the unit and limit the freedom of the non-quarantine patients. Therefore, it was necessary for him to restrict the movement of the quarantined patients. Further, many quarantined patients have problems with authority and it is common for them to destroy hospital property when allowed unrestricted movement. Also, Dr. Neimes had previously experienced problems of escape when he allowed quarantine patients more freedom.

This evidence is sufficient to entitle Dr. Neimes to qualified immunity from Ta's and Fisher's claims of freedom from unreasonable restraint and bodily integrity. However, Dr. Neimes' summary judgment evidence does not address Ta's and Fisher's claims regarding the unsafe and unsanitary condition of their rooms. Therefore, Dr. Neimes is not entitled to qualified immunity from Ta's and Fisher's claims regarding their right to reasonably safe conditions of confinement.

In his affidavit, Dr. Woo states that he was not involved in "deciding the types of confinement for quarantined individuals." Dr. Woo's affidavit goes to the question of his liability, not his immunity. Liability is question of fact to be resolved in the trial court. Accordingly, Dr. Woo has failed to establish that he is entitled to qualified immunity from any of Ta's and Fisher's claims regarding the conditions of their confinement.

### 3. Right to Refuse Medication

Ta claims that his due process rights were violated when he was treated with Prolixin and Haldol without his knowledge or consent. Appellants argue that a quarantined patient's rights not to be involuntarily medicated with anti-psychotic drugs has not been clearly established. In *Washington v. Harper*, 494 U.S. 210, 221, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), the Supreme Court held that prisoners have a significant liberty interest under the Due Process Clause in avoiding the unwanted administration of anti-psychotic drugs. "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321–22, 102 S.Ct. 2452. Therefore, persons who are civilly committed also have a significant liberty interest in avoiding the unwanted administration of anti-psychotic drugs.

■ Dr. Neimes states, in his affidavit, that in his opinion, "the hospital could administer psychiatric drugs without seeking informed consent of the patient so long as the psychiatric treatment was necessary to effectuate the TB treatment that had been ordered by the court." Dr. Neimes also states that he used his professional judgment when he formulated the practice of not seeking informed consent because a court had ordered Dr. Neimes to treat Ta until he was cured and because Ta could not be cured without anti-psychotic medication. Dr. Woo states that he used professional judgment when he decided to medicate Ta without his consent because Dr. Woo could think of no other way to administer the medication. Dr. Woo also states he did not need to get informed consent because a court had ordered the hospital to treat Ta for his tuberculosis until Ta was cured.

Under these circumstances, Dr. Neimes and Dr. Woo have established that they exercised reasonably professional judgment in their decision to administer anti-psychotic drugs to Ta. The evidence reflects that the administration of such drug was necessary to ensure Ta's previously discussed right to safety. Accordingly, Dr. Neimes and Dr. Woo are entitled to qualified immunity from Ta's claims relating his medication.

### 4. Right to Medical Treatment

■ Fisher claims that his due process right to adequate medical treatment was violated when he was not treated for depression until he had been isolated for four months. The right of a civilly committed individual to minimally adequate medical care is well-established and was conceded in *Youngberg.* *See Youngberg,* 457 U.S. at 315, 324, 102 S.Ct. 2452. However, in his affidavit, Dr. Woo states that he used his professional judgment by not seeking a psychiatric consult until Fisher demonstrated signs of depression. In spite of Fisher's history of depression, Dr. Woo could not reasonably be expected to treat a patient for a condition the patient was exhibiting no symptoms of. Accordingly, the evidence is sufficient to establish Dr. Woo's right to immunity from Fisher's due process allegation.

### 5. Right to be Treated in a Familiar Language

■ Ta claims that both his due process and equal protection rights were violated when he was not provided a Vietnamese interpreter during his treatment at the Center. However, there is no clearly established right to be provided an interpreter.

■ A classification based on language is not a classification based on race, religion, or national origin, and is therefore facially neutral. *Soberal–Perez v. Heckler,* 717 F.2d 36, 41 (2nd Cir.1983), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984). If conduct alleged to be discriminatory is facially neutral, plaintiffs must show the action was taken "because of," not "in spite of," its adverse effects upon an identifiable group in order to assert a violation of equal protection. *Id.* at 42. Ta claims that he was deprived of an interpreter because he is Vietnamese. This argument is not sufficient under *Soberal–Perez.* In order to assert an equal protection claim, Ta must have been deprived of an interpreter because of its adverse impact on Ta as a Vietnamese person.

■ Further, Dr. Barbara Seaworth, who was the Center's Infectious Disease Consultant, states in her affidavit that Ta seemed to know enough English to make his needs known and to answer questions. She also states that his family and Vietnamese community leaders spoke with him, and that he was offered the AT & T language line. Seaworth concludes that based on these facts, Dr. Neimes used professional judgment when he decided not to hire a Vietnamese translator. In his affidavit, Dr. Neimes states that he used his professional judgment when deciding not to hire an interpreter based on his assessment of the limited amount of funds available and Ta's ability to speak enough English to make his needs known. Likewise, Dr. Woo's affidavit established professional judgment in dealing with Ta's language barrier. Based upon this evidence, Dr. Neimes and Dr. Woo have established that they are entitled to immunity from Ta's claims regarding his right to be treated in a language he understood.

## C. Official Immunity

In their second point of error, appellants argue that the trial court erred when it denied the appellants' motion for summary judgment based on Dr. Neimes' and Dr. Woo's affirmative defense of official immunity. Official immunity is a state common-law defense that protects government officers and employees from liability. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994). A government employee is entitled to immunity from suit arising from the performance of discretionary duties, as long as the employee acted in good faith and within the scope of his authority. *Id.* It is undisputed that Dr. Neimes and Dr. Woo were acting within the course of their employment while Ta and Fisher were quarantined at the Center. We will, therefore, focus our discussion on discretionary acts and good faith.

Acts involving personal deliberation, decision, and judgment are discretionary while acts requiring obedience to orders or the performance of a duty in which the actor has no choice are ministerial. *Id.* at 654. Once a discretionary act has been established, the type of discretionary act must also be considered in cases involving government employed medical workers. Specifically, "government employed medical workers are immune from claims arising from the exercise of governmental discretion, but are not immune from liability arising from the exercise of medical discretion." *Kassen v. Hatley*, 887 S.W.2d 4, 11 (Tex.1994). The supreme court has characterized the distinction between governmental and medical discretion as one of fact. *Id.* at 6.

Conversely, the test for good faith in official immunity cases involves an objective legal standard. *Chambers*, 883 S.W.2d at 656. The governmental employee has the burden of proving that a reasonably prudent official, under the same or similar circumstances, might have believed that the action taken was justified. *Id.; Murillo v. Vasquez*, 949 S.W.2d 13, 16 (Tex.App.—San Antonio 1997, writ denied). The official does not need to prove that it would have been unreasonable to take a different action or that all reasonably prudent officials would have made the same decision. *Murillo*, 949 S.W.2d at 16.

### 1. Conditions of Confinement and Lack of an Interpreter

Ta and Fisher allege that Dr. Neimes and Dr. Woo violated the Texas Health and Safety Code by confining them to their rooms twenty-two hours a day in unsafe and unsanitary conditions. Ta further contends that Dr. Neimes and Dr. Woo violated the law by failing to treat him in a language he could understand.

We find that Dr. Neimes has sufficiently established the elements of discretion and good faith in order to entitle him to official immunity from suit arising from his actions in confining Ta and Fisher to their rooms and for not providing Ta with an interpreter. In his affidavit, Dr. Neimes states that all policies he implemented were based on his job as administrator, not as a doctor. He states that he based his policies on guidelines from the Centers for Disease Control, the Department of Health, and the Joint Commission for the Accreditation of Hospitals. He also describes the problems he faced in allocating scarce resources for the housing of tuberculosis patients, the fact that he thought he needed to separate the quarantine and nonquarantine patients, and the fact that the legislature denied funding for his plans for a new tuberculosis ward.

Dr. Neimes also states the limited funding influenced his decision not to hire a translator for Ta. The affidavits of Dr. Seaworth and Dr. Robert Longfield, Clinical Director for the Center, state that, given the conditions of the Center and the limited budget, Dr. Neimes acted as any reasonably prudent director of a quarantine hospital would when he implemented the policy of twenty-two hour a day confinement for quarantine patients. Dr. Neimes' affidavit does not, however, address the allegedly unsafe and unsanitary conditions of the rooms. Therefore, while Dr. Neimes has established official immunity from claims arising from his decision to confine Ta and Fisher to their rooms, he has not satisfied his burden of proving the elements of official immunity in relation to

Ta's and Fisher's claims regarding the safety and cleanliness of the rooms.

■ In Dr. Woo's affidavit, he states that he was not involved in the decision to confine quarantine patients to their rooms and he was not involved in the allocation of resources for an interpreter. He also does not address the unsafe and unsanitary conditions of the rooms. The nature of an official's acts and whether the acts were committed within the course and scope of his employment are key to a determination of official immunity. *Boozier v. Hambrick*, 846 S.W.2d 593, 596 (Tex.App.—Houston [1st Dist.] 1993, no writ). In making such a determination, we may not review whether the government employee has established an entitlement to summary judgment on grounds that would be available to any defendant whether he is employed by the government or not. *Id.* Dr. Woo's statement of non-responsibility, then, is not evidence of official immunity, but evidence of non-liability, an issue that is not before us. Accordingly, Dr. Woo is not entitled to official immunity from Ta's and Fisher's claims under the Texas Health and Safety Code.

**2. Informed Consent, Battery and Negligence**

■ Ta claims that the appellants battered him and negligently used medication by causing anti-psychotic medicine to be administered to him without his knowledge and consent. In his affidavit, Dr. Neimes states that he allowed Dr. Woo to medicate Ta without Ta's consent because, in his opinion as the administrator of the Center, the psychiatric treatment was necessary to effectuate the tuberculosis treatment that had been ordered by the court. Dr. Woo states that his decision to medicate Ta without Ta's knowledge was a result of governmental factors because he was ordered to treat Ta until he was cured, and that a private hospital would never have received such a court order. Dr. Woo states that because of its lack of funds, the Center did not have a full time staff psychiatrist, and that the San Antonio State Hospital psychiatrists were not allowed to prescribe medicine, only to recommend it. He further states that the quarantine patients were not cooperative with their medi-

cations and were distrustful of authority and difficult to control. He compares his duties to care for the quarantine patients with that of "prison personnel." He then states that,

> based upon a reasonable degree of medical probability and my years of experience as a quarantine doctor, I believed that psychiatric treatment was the only way to effectuate Mr. Ta's TB treatment.... [B]ased upon a reasonable degree of medical probability, ... [placing the Prolixin in Ta's orange juice or tea] seemed like the least traumatic way to administer this drug.

The problems of limited resources and lack of a full time staff psychiatrist are governmental factors that colored both Dr. Woo's and Dr. Neimes' decision to medicate Ta. The decision to medicate without Ta's knowledge, however, was a purely medical decision. Dr. Neimes and Dr. Woo do not state that they did not seek consent because of limited resources, but because they thought that administering the medication without Ta's knowledge would be the most effective way of treating Ta's tuberculosis while causing the least trauma to Ta. Consequently, Dr. Neimes and Dr. Woo have not conclusively established that Ta's claims regarding the administration of anti-psychotic drugs arose from the exercise of Dr. Neimes' and Dr. Woo's governmental discretion.

■ As to the battery claim, Dr. Neimes and Dr. Woo argue that, under the Medical Liability and Insurance Improvement Act, if a claimant complains that he did not give informed consent before taking medication, the only theory on which recovery may be based is that of negligence. TEX.REV.CIV. STAT. ANN. Art. 4590i, § 6.02 (Vernon Supp. 1998). However, Section 6.02, in its entirety, states that it applies to situations in which the health care provider failed "to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered...." *Id.* Ta is not alleging that he was not informed of the risks and hazards of Prolixin, but that he was not informed Dr. Neimes and Dr. Woo were administering the Prolixin. Therefore, the Medical Liability and Insurance Improvement Act is not applicable to this case.

### 3. False Imprisonment

Ta and Fisher claim that they were falsely imprisoned when they were confined in their rooms for twenty-two hours a day. Additionally, Ta asserts a claim of false imprisonment for being held at the Center after his first court order had expired. The trial court granted the appellants' motion for summary judgment on the false imprisonment claims as they applied to Dr. Neimes; however, the claims are still viable against Dr. Woo. In his affidavit, Dr. Woo states that he was not involved in deciding the type of confinement for quarantined patients and was not involved in the decision to have Ta stay in the hospital after his court order had expired. Again, this statement of non-responsibility does not entitle Dr. Woo to official immunity. *See Boozier,* 846 S.W.2d at 596.

### 4. Declaratory Relief Under the Texas Constitution

Finally, Ta and Fisher seek declaratory relief under the Texas Constitution. Dr. Neimes and Dr. Woo argue that because they have official immunity from suit arising from their actions in treating Ta and Fisher, the trial court should have granted them official immunity from Ta's and Fisher's action for declaratory relief. The Department of Health and the Center assert their sovereign immunity based on Dr. Neimes' and Dr. Woo's official immunity.

As discussed above, Dr. Neimes and Dr. Woo do not have official immunity for all of Ta's and Fisher's claims. Dr. Neimes is entitled to official immunity, and the Center and the Department of Health are entitled to sovereign immunity, from Ta's and Fisher's request for declaratory relief in relation to Dr. Neimes' policy of confining Ta and Fisher to their rooms twenty-two hours a day and for not providing Ta with an interpreter. *See City of Beverly Hills v. Guevara,* 904 S.W.2d 655, 656 (Tex.1995). However, the appellants are not entitled to official immunity from any of the other declaratory relief sought.

### CONCLUSION

We affirm in part and reverse in part the judgment of the trial court. Dr. Neimes and Dr. Woo are entitled to qualified immunity from suit in relation to Ta's and Fishers' allegations of cruel and unusual punishment, Ta's allegations of due process violations in relation to the administration of his medication, Ta's allegations of due process and equal protection violations in relation to his not being provided with an interpreter, and Fisher's allegations of due process violations in relation to his right to appropriate medical treatment. Dr. Neimes is also entitled to qualified immunity from suit regarding the alleged violation of Ta's and Fisher's due process rights to be free from unreasonable restraint and to bodily integrity.

Further, Dr. Neimes is entitled to official immunity from suit arising from his decisions to confine Ta and Fisher to their rooms twenty-two hours a day and not to provide Ta with an interpreter. Dr. Neimes is also entitled to official immunity, and the Center and the Department of Health are entitled to sovereign immunity, from Ta's and Fisher's action for declaratory relief in regard to the Center's policy of confining Ta and Fisher to their rooms twenty-two hours a day and not providing Ta with an interpreter. The trial court's judgment is otherwise affirmed. This case is remanded to the trial court for further proceedings consistent with this opinion.

Dissenting opinion by CATHERINE STONE, Justice.

STONE, Justice, dissenting.

Reminiscent of dark images from Solzhenitsyn's *Gulag Archipelago,* Kien Chung Ta and Stephen Fisher filed suit against the Texas Department of Health, the San Antonio State Chest Hospital, and two doctors associated with the hospital, alleging Ta and Fisher were the victims of gross mistreatment while hospitalized for treatment of tuberculosis. The Department, the Hospital, and Drs. Neimes and Woo denied the allegations and sought summary judgment declaring them immune from liability under the very difficult facts of this case, which all too clearly reveal the precarious position of doctors and health care facilities when they treat non-compliant patients who have dangerous contagious diseases. But no trial court or

jury will ever have the opportunity to sift through the evidence and grapple with the important issues presented, because a majority of this court has concluded that they cannot determine whether the trial court considered Ta and Fisher's late-filed response to the motion for summary judgment. Unable to determine whether the response was considered by the trial court, the majority presumes that it was not, ultimately leading the majority to substantially reverse the trial court's ruling on the motion for summary judgment. Because the record before this court indicates that the trial court did consider Ta and Fisher's late-filed response to the motion for summary judgment, and because the response precludes summary judgment in favor of the appellants, I dissent.

The response to the motion for summary judgment with attached affidavits should be considered by this court because the record indicates that it was considered by the trial court. The majority relies on numerous cases, several from this court, which stand for the proposition that appellate courts presume the trial court did not consider a late-filed response unless the record indicates that the trial court granted leave to file the untimely response.[1] The cases cited in the majority opinion are all similar in that there was *nothing* in the record in those cases which the appellate court could cite as evidence that the trial court allowed the late-filed response. *See INA of Texas v. Bryant,* 686 S.W.2d 614, 615 (Tex.1985) ("nothing appears of record to indicate that the late filing was with leave of court"); *Evans v. Conlee,* 741 S.W.2d 504, 509–10 (Tex.App.—Corpus Christi 1987, no writ) ("record does not reflect that leave of court to file a late response

was requested or granted;" since controverting affidavit not mentioned in the judgment, court presumed it was not considered); *Pinckley v. Gallegos,* 740 S.W.2d 529, 531 (Tex.App.—San Antonio 1987, writ denied) (record failed to "reflect that any request for leave to file a late response" was filed and was silent about whether the trial court considered the untimely response); *Nava v. Steubing,* 700 S.W.2d 668, 670–71 (Tex. App.—San Antonio 1985, no writ) (response to summary judgment and motion for leave to file late response were both filed six days after the summary judgment hearing; there was no order on the motion for leave and the judgment was otherwise silent about the late-filed response; court presumed that the trial court did not allow the late-filed response).

The cited cases are distinguishable from the instant case. In this case, the record does not contain an order permitting the late-filed response, but the record does reflect that the trial court considered the response. Appellants received a copy of Ta and Fisher's response to the motion for summary judgment in time to prepare written objections to the response and the attached affidavit of Dr. Aitcheson.[2] Appellants' written objections were ruled upon by the trial court, and the court's written rulings are contained in the record. This is surely evidence that the trial court allowed the late-filed response. Why would the trial court rule on objections if it was not going to consider the response at all because of its untimely filing?[3] By contrast, none of the cases relied on by the majority involve a situation where there was a ruling by the trial court on substantive objections to the response. When, as here, the record reflects that late-filed pleadings were considered by

---

1. The cases relied upon by the majority refer to whether there is an affirmative indication *in the record* that the trial court considered the late-filed response. The majority notes several times that the trial court's *judgment* does not affirmatively state that the late-filed response was considered. This requirement is more stringent than previous interpretations of Rule 166a.

2. In light of appellants' written reply and objections to the response, it is unsettling that appellants argued on appeal that the response was not filed until after the hearing. In any event, the record contains a file-stamped copy of the re-

sponse showing it was filed on the same day as the hearing was held. Ta and Fisher have indicated in their briefs that the response was hand-delivered to appellants' counsel and mailed to the Bexar County District Clerk several days earlier.

3. Contrary to the majority's conclusion that this question invites us to speculate, it is nothing more than an attempt to draw reasonable inferences from the record—a function very much within the bounds of our role as a reviewing court.

the trial court, then any failure to obtain permission for the late-filing is corrected. *See Goswami v. Metropolitan Savings & Loan Ass'n,* 751 S.W.2d 487, 490 (Tex.1988); *Rath v. State,* 788 S.W.2d 48, 50 (Tex.App.— Corpus Christi 1990, writ denied).

Additionally, appellants have waived their complaint about the late-filed response. Undoubtedly Rule 166a places on Ta and Fisher the burden to obtain permission to file their response late. It does not follow, however, that placement of that burden on the non-movants thereby relieves the movants of the duty to object to a late-filed response. Here, the appellants filed substantive objections to the response and controverting evidence, obtained written rulings on those objections, and then "laid behind the log" until appeal before raising any objection about the timeliness of the response. This exemplifies the type of gamesmanship that courts are loathe to endorse. The majority's concern that even greater gamesmanship will result if we consider this late-filed response suffers from a fundamental flaw: merely objecting to a non-movant's late-filed response does not "unwittingly ensur[e]" that the trial court will be presumed to have permitted the late filing. *See* op. at 138–139. It is the affirmative action of the appellants in presenting the objections and obtaining written rulings upon the objections that leads to the logical presumption that the court indeed allowed and considered the late-filed response. The court's order ruling on appellants' objections is an affirmative indication of the court's grant of leave to file untimely.

As further indication that the trial court in fact considered Ta and Fisher's response, one need only look at the outcome in the court below. The substantive objections raised by appellants were in large part denied by the trial court, and thereafter the motion for summary judgment was denied. On appeal appellants attack the very issues raised in the trial court by their substantive objections. This is in contrast to many of the cases relied upon by the majority, where the record was silent about consideration of the late-filed response, and the trial court granted the summary judgment. *See e.g., Nava,* 700 S.W.2d at 670.

Further, there is authority for requiring appellants to preserve their complaint by objection in the trial court. *See Davis v. Davis,* 734 S.W.2d 707, 712 (Tex.App.— Houston [1st Dist.] 1987, writ ref'd n.r.e.) (allegation that party received less notice than required by statute does not present a jurisdictional question and therefore may not be raised for the first time on appeal). Generally, a party's right to complain about late-filed documents is subject to waiver if not made to the trial court. *See Hudenburg v. Neff,* 643 S.W.2d 517, 519 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 313 (1983). The Dallas Court of Appeals reached the same conclusion in the summary judgment context in *City of Coppell v. General Homes Corp.,* 763 S.W.2d 448 (Tex.App.— Dallas 1988, writ denied). In that case the city filed its amended answer and its controverting affidavits and brief opposing General Homes' motion for summary judgment on August 17. The summary judgment hearing was held on August 24. On appeal General Homes contended the filing was not a full seven days before the hearing as required by TEX.R. CIV. P. 166a. *Id.* at 451. The court rejected General Homes' argument, not because it determined that the filing was timely, but because General Homes did not file a motion to strike the documents and thus failed to preserve its complaint. *Id.*

The need to preserve error by objecting to the timeliness of the response is in keeping with the Supreme Court's general emphasis on preservation, even in the summary judgment arena. Surely if a summary judgment movant should file special exceptions to a non-movant's summary judgment response when the grounds of opposition are not sufficiently clear, *see McConnell v. Southside I.S.D.,* 858 S.W.2d 337, 343 (Tex.1993), then a summary judgment movant should object to a non-movant's summary judgment response when it is untimely filed.

Finally, the majority asks whether the court should "permit any ruling regarding a pleading to constitute leave to file that pleading," and answers its own question in the negative. Op. at 140. This answer is apparently driven by a concern that the burden

remain on the non-movants to obtain leave to file their response late. The majority implies that requiring the movants to object to the late-filed response impermissibly shifts the burden established by Rule 166a, and would have potentially deleterious implications in future cases. This musing by the majority is particularly interesting in light of *Verburgt v. Dorner*, 959 S.W.2d 615 (Tex.1997), in which the supreme court overruled this court and held that despite the dictates of TEX.R.APP. P. 41(a)(1)(2),[4] a notice of appeal or cost bond filed within the fifteen-day grace period vests an appellate court with jurisdiction, even if not accompanied by a motion for extension of time. *Verburgt*, 959 S.W.2d at 617. The court ruled that the filing of a perfecting instrument within the grace period necessarily implies a motion for extension of time. *Id.* *Verburgt* involved a matter of jurisdiction, and yet the supreme court was willing to deviate from the literal terms of the governing rule. *Id.* The instant case does not even raise issues of jurisdictional import, yet the majority remains wedded to a literal reading of Rule 166a that is more restrictive than any other reported interpretation of the rule. The end result is that form has prevailed over substance. For these reasons, I dissent.