**K–SIX TELEVISION, INC., et al., Appellants,**

v.

**Angel SANTIAGO, Appellee.**

**No. 04–01–00592–CV.**

Court of Appeals of Texas, San Antonio.

Feb. 13, 2002.

Rehearing Overruled March 1, 2002.

---

1. On this date, the en banc court in a separate order denied appellees' motion for en banc rehearing.

Jorge C. Rangel, William E. Maxwell, Law Offices of Jorge C. Rangel, Corpus Christi, for Appellant.

Edward P. Fahey, Jr., Attorney At Law, Laredo, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, PAUL W. GREEN, Justice.

Opinion by ALMA L. LÓPEZ, Justice.

This accelerated appeal challenges the trial court's denial of both traditional and no-evidence motions for summary judgment in a defamation action against media defendants. The defamation action arose out of a story aired during two news broadcasts. The appellants contend that the trial court erred in denying their no-evidence motion for summary judgment because no evidence was produced that the statements were false or were made negligently or with actual malice. The appellants further contend that the trial court erred in denying their traditional motion for summary judgment because the broadcasts were true or substantially true and the evidence conclusively established that the statements were not made negligently or with actual malice. We reverse the trial court's orders and render judgment in favor of the appellants.

## BACKGROUND

Angel Santiago ("Santiago") sued K–Six Television, Inc. ("K–Six") and several of its employees after a story was aired on two news broadcasts regarding allegations that Santiago was responsible for funds missing from the Laredo Amateur Boxing Club, a non-profit corporation ("LABC"). Santiago was president of LABC from its inception in 1991 until June of 2000, when he resigned. As president, Santiago was the only authorized signatory on LABC's checking account, and he maintained all of the monthly statements and financial documents required by the United Way, which provided funding to LABC.

David Cortez ("Cortez"), the assignments editor for K–Six, received an unsolicited phone call from Richard Geisler regarding a possible story involving wrongdoings at LABC. Geisler provided Cortez with numerous financial documents. Cortez assigned the story to Devin Helmes ("Helmes"). Helmes set up a meeting with three LABC coaches—Alfonso Holguin, Juan Ramirez, and Paul Raymond Buitron, III. The coaches informed him that LABC was missing funds and Santiago was responsible. The coaches provided Helmes with various examples of missing funds. The coaches informed Helmes that they had contacted the IRS and asked the IRS to investigate. The coaches further informed Helmes that Santiago had resigned because they told him they were beginning an investigation. In response to Helmes's call before airing the story, Santiago declined to comment; however, Santiago stated in his deposition that he resigned for various reasons, including false allegations that he was maliciously tampering.

Based on the information Helmes received from the coaches, K–Six aired a news story regarding the coaches' allegations of missing funds on two separate broadcasts on October 12, 2000. The first broadcast stated:

AMANDA SALINAS: Straight ahead on Newswatch 13, there's a possible connection with the USS Cole here in Laredo. We spoke with one family member. We've got information for you.

Also, stories of stealing money. Devin Helmes has an exclusive. All this, plus weather and sports are coming up on Newswatch 13.

(Fade).

(Commercial).

ANNOUNCER: Live from the KVTV studios in Laredo, this is Newswatch 13, Thursday.

AMANDA SALINAS: Good evening, everyone, and thanks for joining Newswatch 13. I'm Amanda Salinas. Newswatch 13 does have some information that a Laredo area man who is stationed in Norfolk, Virginia—

(Fade).

AMANDA SALINAS:—news of the moment. Members of a nonprofit club are coming forward and questioning where their funding's going. Volunteers at the Laredo Amateur Boxing Club want answers from the organization's former president as to what he did with the club's money. Our Devin Helmes met with some of the group's coaches today, and he's standing by, live in the newsroom, with the latest. Devin.

DEVIN HELMES: Thanks, Amanda. It's a club to keep boys and girls off the street and improve the quality of their lives, but according to some people who volunteer there, the only person benefitting from the club is its former president.

ALFONSO HOLGUIN: And I used this money to—for to buy some supplies

for the gym, but I never saw any— any—any new items there.

DEVIN HELMES: Coach Holguin and others are questioning where almost $15,000 of the organization's money went. They're curious, because they have all last year's expense reports, but it doesn't make any sense. At that time, the gym was being renovated and wasn't open.

ALFONSO HOLGUIN: For the year—the reported year, I think it's $14,000, nearly $15,000 in expenditures, and the club was not operating.

DEVIN HELMES: They're alleging club president, Angel Santiago, was taking it. They say he was the only one who handled all the paperwork.

ALFONSO HOLGUIN: He had control of everything. He was the president. He was the South Texas President for the USBA. He was the treasurer. Nobody have [sic] any access of the monies except him.

DEVIN HELMES: Just this month their accountant decided to retire his post as treasurer because of a supposed busy schedule. Santiago also retired this July after the coaches told him they were investigating.

JUAN RAMIREZ: Santiago—

PERSON OFF CAMERA: Quit.

JUAN RAMIREZ:—quit because he was doing something wrong.

DEVIN HELMES: Volunteers have pages of proof that they say incriminate the former president. Apparently thousands of dollars was given to them from their supporter, United Way, and from club members in dues, money that was supposedly never given to who it really belonged, the children.

PAUL RAYMOND BUITRON, III: A lot of them see me in the streets and they tell me, "Hey, what's going on with boxing? I never got anything. I paid my dues to Laredo Boxing Club." And I go, "What do you mean you paid it to Laredo Boxing Club? It's supposed to be a check to the South Texas Amateur Boxing Association."

DEVIN HELMES: Amanda, I talked to Mr. Santiago on the phone, and he declined to comment on camera, as he said, on things he knew nothing about. But he did tell me he resigned for many reasons, one being that people weren't happy with the way he was running things down there. Now, as for the coaches, they said the IRS is looking into matters. All they want to know is where that money went, and they want it back. No lawsuits have been filed at this time, but the coaches are looking into one. Live in the newsroom, I'm Devin Helmes.

AMANDA SALINAS: Now, Devin, you say no lawsuits have been filed, and you also tell us that—or it seems to me that this would be a matter of theft. Has the Police Department been notified and maybe some sort of criminal complaint already been made on Santiago?

DEVIN HELMES: Yes. Nothing has been done so far. All they told me was the IRS was looking into things. They said they brought it attention—it to the attention of the board of directors and things like that. But at this time, there's no sort of criminal investigation going on. There's no sort of—the District Attorney is not involved, so the IRS is the only people [sic] dealing with it at this time.

AMANDA SALINAS: Okay. Thank you very much, Devin. In other news, Border Area Drug Conference continued today—

(Fade).

The second broadcast stated:

AMANDA SALINAS:—as early as tomorrow morning. It could be later.

In other news from around the city, members of a nonprofit club are coming forward and questioning where their funding is going. Volunteers at the Laredo Amateur Boxing Club want answers from the organization's former president as to what he did with the money. Newswatch 13's Devin Helmes met with some of the group's coaches today. He tells us that it's a club to keep boys and girls off the streets and to improve their quality of life. But according to some people who volunteer there, the only person who benefitted from this club was its former president.

ALFONSO HOLGUIN: And I used this money to—for to buy some supplies for the gym, but I never saw any—any—any new items there.

DEVIN HELMES: Coach Holguin and others are questioning where almost $15,000 of the organization's money went. They're curious because they have all last year's expense reports, but it doesn't make any sense. At that time, the gym was being renovated and wasn't open.

ALFONSO HOLGUIN: For the year—the reported year, I think it's $14,000, nearly $15,000 in expenditures, and the club was not operating.

DEVIN HELMES: They're alleging former club president, Angel Santiago, was taking it. They say he was the only one who handled all the paperwork.

ALFONSO HOLGUIN: He had control of everything. He was the president. He was the South—South Texas President for the USBA. He was the treasurer. Nobody have [sic] any access of the monies except him.

DEVIN HELMES: Just this month their accountant decided to retire his post as treasurer because of a supposed busy schedule. Santiago also retired this July after the coaches told him they were investigating.

JUAN RAMIREZ: Santiago—

PERSON OFF CAMERA: Quit.

JUAN RAMIREZ:—quit because he was doing something wrong.

DEVIN HELMES: Volunteers have pages of proof that they say incriminate the former president. Apparently thousands of dollars was given to them from their supporter, United Way, and from club members in dues, money that was supposedly never given to who it really belonged, the children.

PAUL RAYMOND BUITRON, III: A lot of them see me in the streets and they tell me, "Hey, what's going on with boxing? I never got anything. I paid my dues to Laredo Boxing Club." And I go, "What do you mean you paid it to Laredo Boxing Club? It's supposed to be a check to the South Texas Amateur Boxing Association."

AMANDA SALINAS: Again, that was Devin Helmes reporting, and Devin did speak to Mr. Santiago on the phone, but Mr. Santiago declined to comment on camera, because he said he didn't want to talk about the situation. We are told that this club has filed charges with the IRS—rather they have notified the IRS and then charges will be taken later on during this year. In other news, Border Area Drug Conference continued today at the Civic Center. Audience members—

(Fade).

(End of videotape).

Santiago subsequently sued K–Six and several of its employees for defamation. The appellants appeal the trial court's orders denying their traditional and no-evidence motions for summary judgment.

JURISDICTION

■ Santiago contends that this court does not have jurisdiction to consider this

appeal because the appellants did not raise any constitutional claims or defenses in their motions for summary judgment.

Section 51.014(a)(6) of the Texas Civil Practice and Remedies Code ("Code") permits a person to appeal a denial of a motion for summary judgment "that is based in whole or part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article 1, Section 8, of the Texas Constitution, or Chapter 73 [of the Code]." TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(6) (Vernon Supp.2001). Section 73.004 of the Code requires a party complaining of a defamatory statement published or uttered as part of a television broadcast to prove that the broadcasting party failed to exercise due care. TEX. CIV. PRAC. & REM.CODE ANN. § 73.004 (Vernon 1997). In addition, section 73.005 of the Code provides that truth is a defense to an action for libel. TEX. CIV. PRAC. & REM.CODE ANN. § 73.005 (Vernon 1997).

The appellants' motions for summary judgment rely in part on the law of libel contained in chapter 73 of the Code. Therefore, the entirety of the trial court's orders are appealable pursuant to section 51.014(a)(6). *American Broadcasting Companies, Inc. v. Gill,* 6 S.W.3d 19, 26 (Tex.App.-San Antonio 1999, pet. denied), *overruled in part on other grounds, Turner v. KTRK Television, Inc.,* 38 S.W.3d 103 (Tex.2000).

### TIMELINESS OF RESPONSES AND SUMMARY JUDGMENT EVIDENCE

■ The appellants contend that Santiago's responses to their motions for sum-

mary judgment were untimely; therefore, this court should not consider the responses. The summary judgment hearing was held on August 17, 2001. Santiago filed a response to the traditional motion for summary judgment on August 13, 2001, a response to the no-evidence motion for summary judgment on August 13, 2001, and a first amended response to the no-evidence motion for summary judgment on August 17, 2001. Both of the responses and the first amended response state that they are untimely filed.

■ A response to a motion for summary judgment, including opposing summary judgment evidence, may be filed no later than the seventh day before the date of the hearing "[e]xcept on leave of court." TEX.R. CIV. P. 166a(c); *Neimes v. Ta,* 985 S.W.2d 132, 139 (Tex.App.-San Antonio 1998, pet. dism'd by agr.). The record must contain an affirmative indication that the trial court permitted the late filing of a response or the response is a nullity. *Neimes v. Ta,* 985 S.W.2d at 139. If the record contains nothing indicating that the trial court considered a late-filed response, we presume the trial court did not consider it, and the response will not be considered on appeal. *Id.* Permission to file a late response may be reflected in a recital in the summary judgment. *Id.*

■ In this case, each of the orders denying appellants' motions recite that the trial court considered the response. Neither order recites that the trial court considered the amended response. Therefore, this court will presume that the trial court did not consider the amended response, and we will not consider the amended response on appeal. *See id.*

■ The appellants note that the appendix to Santiago's brief contains deposition

exhibits that were not on file with the trial court. Although we can consider the depositions contained in our clerk's record that were on file at the time of the summary judgment hearing and were referenced in Santiago's response, we cannot consider the exhibits to those depositions which were not on file with the trial court and are not contained in our clerk's record. *See* Tex.R. Civ. P. 166a(c); *Till v. Thomas,* 10 S.W.3d 730, 733–34 (Tex.App.-Houston [1st Dist.] 1999, no pet.) (holding appellate courts cannot consider documents attached to briefs that do not appear in the appellate record).

## STANDARD OF REVIEW

The appellants filed both a traditional motion for summary judgment and a no evidence motion for summary judgment.

Under traditional summary judgment standards, a party moving for summary judgment has the burden of establishing as a matter of law that no genuine issue of material fact exists as to one or more essential elements of the plaintiff's cause of action. *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). If the defendant meets this burden, the plaintiff must then raise a genuine issue of material fact on that element. *Gonzalez v. City of Harlingen,* 814 S.W.2d 109, 112 (Tex.App.-Corpus Christi 1991, writ denied). In reviewing a summary judgment, an appellate court accepts as true all evidence supporting the nonmovant. *Nixon,* 690 S.W.2d at 549. All inferences are indulged in favor of the nonmovant, and all doubts are resolved in his favor. *Id.*

We apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied). We look at the evidence in the light most favorable to the respondent against whom the summary judgment was rendered, disregarding all contrary evidence and inferences. *Moore,* 981 S.W.2d at 269. A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.* Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Id.* More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

## NEGLIGENCE/ACTUAL MALICE

One ground on which the appellants moved for both a traditional and a no-evidence summary judgment was the absence of fault.

The appellants contend that Santiago was a public figure and, as such, the applicable "fault" standard was actual malice. Alternatively, the appellants argue that even if negligence was the applicable standard, Santiago did not produce any evidence of negligence and the absence of negligence was conclusively established.

For purposes of this appeal, we will assume, without deciding, that Santiago is not a public figure and that the applicable "fault" standard is negligence. Under this standard, Santiago is only entitled to recover if he shows that the appellants were negligent with regard to the alleged falsity of the broadcast. *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809, 819–20 (Tex. 1976).

### A. No Evidence

■ The appellants' no-evidence motion for summary judgment asserted, "there is

no evidence that the broadcasts or statements contained therein were false; there is no evidence that K–Six broadcast the statements with actual malice; and there is no evidence that K–Six was negligent in the broadcast or in the airing of the statements complained of." In response to the appellants' no-evidence motion for summary judgment on this issue, Santiago was required to produce a scintilla of evidence to show that the appellants had acted negligently. The only evidence produced in response to the no evidence motion was a transcript of the broadcasts. Nothing contained in the transcript evidences any negligence on the part of the appellants.

Santiago states in his brief that "[a] transcript of Helmes deposition was given to the court. And in oral argument, the negligence points set forth in section 4 of this brief were recited to the court. It's in the transcript of the hearing." Our record does not contain a transcript of the hearing, and the response to the no-evidence motion for summary judgment does not rely on the transcript of Helmes's deposition to point out specific instances of negligence.

The trial court erred in denying the no-evidence motion for summary judgment because Santiago failed to produce a scintilla of evidence to show that the appellants had acted negligently.

### A. Traditional

■ The appellants also moved for summary judgment on traditional grounds contending that as a matter of law no genuine issue of material fact existed as to the negligence element of Santiago's claim.

Helmes's affidavit, which was attached to the motion, detailed the steps he took in investigating the story and checking several sources. In addition, the appellants presented the affidavit of an expert, a journalism professor, who reviewed the investi-

gation undertaken in view of the applicable standard of care and opined that the appellants did not act negligently.

Santiago counters that Helmes was a young reporter whose story was not reviewed for defamatory content. Although Helmes's story was not reviewed by the station manager, the producer told Helmes to verify his facts after she was informed of the nature of the story. Santiago complains that the appellants were negligent by not investigating further; however, Santiago offered no evidence to support his assertions regarding the facts additional investigation would have revealed. Therefore, no evidence is contained in our record that controverts the nature of the investigation undertaken by Helmes or the expert's opinion that such investigation was not negligent.

The trial court erred in denying the traditional motion for summary judgment because the appellants established as a matter of law that no genuine issue of material fact existed as to the negligence element of Santiago's claim.

### CONCLUSION

The trial court's orders are reversed, and judgment is rendered that Angel Santiago take nothing with regard to his claims against appellants.