Walter A. CHRUBY, Appellant,

v.

Frank D. GILLIS, Superintendent, S.C.I, Coal Township, Attorney General of Pennsylvania.

No. 01–2913.

United States Court of Appeals, Third Circuit.

Argued Oct. 31, 2002.

Decided Nov. 29, 2002.

F. Emmett Fitzpatrick (Argued), Nialena Caravasos (Argued), F. Emmett Fitzpatrick, P.C., Philadelphia, PA, John Andrews, John M. Updegraph, Andrews & Koufman, LLC, Salem, MA, Lee G. Nollau, Nollau & Young, State College, PA, for Appellant.

Ray Gricar (Argued), Mark S. Smith, Office of District Attorney, Bellefonte, PA, for Appellees.

Before SLOVITER and FUENTES, Circuit Judges and FULLAM,* District Judge.

---

* The Honorable John P. Fullam, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

FUENTES, Circuit Judge.

Petitioner Walter A. Chruby appeals the District Court's denial of his petition for writ of habeas corpus. In his petition, Chruby challenges the constitutionality of his state court conviction of first-degree murder and related crimes. Petitioner asserts that the pre-arrest statements he made to his probation officer and evidence discovered following his arrest should have been suppressed because his probation officer did not advise him of his *Miranda* rights prior to questioning him.[1] Additionally, petitioner brings a claim for ineffective assistance of counsel. Because we agree with the District Court that *Miranda* rights did not attach and because petitioner was not prejudiced by his trial counsel's performance, we affirm.

### I.  *Facts and Procedural Background*

The facts and circumstances of this case stem from the murder of Ruth Fergus on September 3, 1995. After a jury trial, defendant Chruby was convicted of first-degree murder and related theft offenses. The issues on appeal concern the initial interview Chruby had with a probation officer just after the Fergus murder and to comments made by Chruby's defense attorney during trial.

### A.  *Facts relating to Appellants' assertion that Probation Officer Fox should have Mirandized him prior to interviewing him*

Charles Fox was employed as a probation officer assigned to the Harrisburg, Pennsylvania office. In mid-August 1995, he was assigned to supervise Chruby, who was soon to be released from federal prison. As per Fox's instruction, Chruby called Fox to let him know he was being released from prison on August 28, 1995.

On August 31, 1995, the day before Chruby was to report to Fox for his initial interview, Officer Sleeth of the State College Police called Fox and told him that he had caught Chruby driving his ex-wife's car without permission, that the ex-wife had declined to prosecute him, that Chruby made threats of suicide and that he was taken to the hospital and released later that day. On the day of the initial interview, Chruby called Fox and told him he could not appear because he had transportation problems. Fox rescheduled the appointment for September 5. On September 5 Chruby called to again cancel his interview because he still had no transportation. Fox rescheduled the appointment for 3:30 p.m. on September 7.

However, on September 6, Fox got a call from John Shoemaker, another State College Police Officer, who told him that the police were looking for Chruby and had a warrant for his arrest on a bad check charge. Shoemaker also said they wanted a photograph of Chruby. Fox told Shoemaker that he was scheduled to meet with Chruby the next day.

On September 7, Shoemaker and Detective Dann, both from State College Police Department, and Detective Inschweiler of Dauphin County came to Fox's office. They told him that Chruby was a suspect in a homicide investigation but that they did not have enough evidence to charge him. At the probation office it was determined that the officers would wait in a separate office during Fox's interview with Chruby and thereafter Shoemaker would arrest Chruby on the bad check warrant. According to Fox, the police asked him to interrogate Chruby about matters related to their criminal investigation, such as

---

1.  *See Miranda v. Arizona,* 384 U.S. 436, 86    S.Ct. 1602, 16 L.Ed.2d 694 (1966)

where he had been presently staying, where he had been for the past couple of days, where the car was, and how he got to the appointment in Harrisburg from State College.

When Chruby arrived, Fox met him in the lobby and escorted him back to his office. When Fox asked him where he had parked, Chruby responded that he had parked in the Walnut Street Garage across from the federal building. Fox asked Chruby how he got to the probation office and Chruby responded that a friend named "Dave" whose last name he did not know drove him in. Fox started the standard installation interview and reviewed with Chruby the rules and conditions that would apply to his probation. He asked Chruby if he had any pending cases against him and, after Chruby responded in the negative, Fox told him about the bad check charge. After the interview, Fox took Chruby to the officers, who were now waiting in the lobby.

Officer Shoemaker arrested Chruby on the bad check warrant. Officer Dann patted Chruby down for weapons and Officer Shoemaker went into Fox's office, where he learned from Fox that Chruby initially said he had driven to the interview and parked in the Walnut Street Garage, but later said he had gotten a ride from someone named Dave. Thereafter, Dann gave Shoemaker a Ford car key and a Walnut Street Garage ticket he had removed from Chruby. Shoemaker asked Chruby where the car was parked and Chruby responded that it was not his car and that he had gotten a ride from Dave. The police located the automobile in the Walnut Street Garage and determined that it belonged to the murder victim, Ruth Fergus. The key in Chruby's pocket fit the ignition. Found hidden in a blood stained glove in the undercarriage of the car was Fergus' credit card. On October 4, 1995, an eight-count criminal information was filed against Chruby for the murder of Ruth Fergus. His trial commenced on June 23, 1997.

### B. *Facts relating to Appellant's assertion that he received ineffective assistance of counsel at trial*

After promising the jury four times, in a delayed opening statement, that Chruby would testify, defense counsel did not call Chruby to the stand. According to Chruby, trial counsel warned him that he would get the needle if he testified. During the trial, defense counsel also told the jury that Chruby had used the victim's credit card and had stolen her car. Chruby claims he was prejudiced because he intended to take the stand and tell the jury that he had not committed these acts. The trial judge instructed the jury not to draw any inference of guilt from Chruby's exercise of his constitutional right to elect to remain silent and not testify on his own behalf.

Following the jury trial and verdict, the jury sentenced Chruby to life imprisonment on the murder charge. The trial judge added concurrent and consecutive sentences for the related theft charges. Chruby brought post-sentence motions in which he asserted that (1) the trial court made various errors; (2) the Commonwealth was guilty of prosecutorial misconduct; and (3) his trial counsel was ineffective. After unsuccessfully appealing his conviction to the Pennsylvania Superior Court and the Pennsylvania Supreme Court, appellant filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Pennsylvania on July 13, 2000. He alleged that he is in custody pursuant to a judgment of a state court in violation of the Constitution. The District Court denied the petition and found no basis for a certificate of

appealability. This Court granted a certificate of appealability.

## II. *Jurisdiction and Standard of Review*

The District Court exercised jurisdiction over this matter under 28 U.S.C. § 2254. We have appellate jurisdiction under 28 U.S.C. § 1291.

In habeas corpus appeals, this Court conducts a *de novo* review of the district court's rulings. *See, e.g., Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). The Court is to decide what is clearly established law as determined by the Supreme Court, *see Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), then determine whether the state court's decision was "contrary to" or "an unreasonable application of" that law. *Id.* at 404–05, 120 S.Ct. 1495 (citing 28 U.S.C. § 2254(d)(1)). Each of these clauses has an independent meaning. *See id.* at 405, 120 S.Ct. 1495.

A state court decision can be "contrary to" the Supreme Court's clearly established precedent in one of two ways: (1) if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, *see id.* at 405, 120 S.Ct. 1495; or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.* at 406, 120 S.Ct. 1495.

A state-court decision involves an "unreasonable application" of Supreme Court precedent if (1) the state court identifies the correct legal rule from controlling Supreme Court cases but unreasonably applies it to the facts of presented by the state prisoner; or (2) if the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or

refuses to extend that principle to a new context where it should apply. *See id.* at 407, 120 S.Ct. 1495.

The state court's determinations of factual issues are presumed correct. *See* 28 U.S.C. § 2254(e)(1). The petitioner bears the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

## III. *Discussion*

Relying on *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), Chruby asserts that Probation Officer Fox acted as an agent of the police and thus his questioning gave rise to a Fifth Amendment privilege. In *Minnesota v. Murphy,* the Supreme Court held that a probationer must timely assert his Fifth Amendment privilege when questioned by his probation officer if the probationer's privilege is to be preserved. The Court recognized three exceptions to that general rule: when the incriminating statement was "obtained from suspects in police custody[,]" *id.* at 429, 104 S.Ct. 1136; "where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and ... compe[l] ... incriminating testimony[,]' " *id.* at 434, 104 S.Ct. 1136 (citation omitted); and "in the context of the federal occupational and excise taxes on gamblers[,]" *id.* at 439, 104 S.Ct. 1136.

In arriving at its conclusion that Murphy was not in custody and hence did not fall within the first exception, the Supreme Court reasoned that: (1) the fact that he was under legal compulsion to attend the meeting and to answer his probation officer's questions truthfully did not excuse his failure to exercise his Fifth Amendment privilege even though the probation officer was anticipating incriminating answers; *see id.* at 431, 104 S.Ct. 1136; and that (2) due to the nature of probation,

Murphy should have expected to be questioned on a wide range of topics related to his past criminality and therefore he was not deprived of a right to seek counsel before attending the meeting. *See id.* at 432, 104 S.Ct. 1136.

In *Murphy,* the Court emphasized that it has "consistently held" that the "extraordinary safeguard" of exclusion of incriminating statements "does not apply outside the context of the inherently coercive custodial interrogation for which it was designed." *Id.* at 430, 104 S.Ct. 1136 (citations omitted). *See also Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (statements obtained by an undercover agent posing as a prisoner held admissible because of the absence of a "police-dominated atmosphere" and "compulsion").

■ Whether a suspect is in custody depends on whether, under the totality of the circumstances, a reasonable person in his position would feel free to leave. *See Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Chruby argues that he falls within the custodial interrogation exception, but the record of the evidentiary hearing on Chruby's motion to suppress is devoid of any evidence showing that he felt like he was not free to leave. The record presented at the evidentiary hearing did not show that Chruby was aware of the police presence outside of Fox's office before Fox told him he would be arrested in the bad check warrant and introduced him to the officers. Moreover, even in light of Chruby's testimony during a hearing on post-sentence motions, we conclude that a reasonable person in his circumstances would not feel that he was not free to leave.

Chruby asserts that he was frisked when he entered the federal building even though he had not been frisked other times he had entered the building and that he was frisked as soon as he entered Fox's office. After searching him, Fox told him he was going to take his picture. Even if these events marked departures from Chruby's previous experience, they do not give rise to a reasonable sense of being unable to leave. Additionally, Chruby asserts that he saw officers sitting directly across the hallway from where he was sitting and thought they were there to talk to him about the car he had stolen.

It was not reasonable for Chruby to have believed that he was not free to leave after seeing the officers because (1) Fox's questioning as to how he had gotten to the meeting should have come as no surprise because he had told Fox previously, when calling to reset the date for his installation interview, that he had been experiencing transportation problems; and (2) he did not know at the time Fox questioned him that the police were planning to arrest him on a bad check warrant. Therefore, even if he saw the officers at the federal building, at the time that he was questioned, he had no reasonable basis for thinking they were there to arrest him.

Chruby does not contend that he falls within the other two exceptions discussed in *Murphy* that requires prior *Miranda* warnings. Accordingly, the District Court correctly concluded that it was not unreasonable for the state superior court to conclude that Chruby, like the defendant in *Minnesota v. Murphy,* was not entitled to be *Mirandized.*

Moreover, even were the Court to accept Chruby's argument that he was in custody and therefore that his statements to Fox should have been excluded, he cannot seriously dispute that the officers would have discovered the car key and thereby the incriminating evidence in the car. This is because, when an officer makes an arrest of a suspect based on

probable cause, "a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

■ Chruby's ineffective assistance of counsel claim also fails to warrant habeas relief. Chruby asserts that he did not testify because his trial counsel made an unauthorized admission to the jury that he had used the victim's credit card and had stolen her car and therefore, had he taken the stand, he would have contradicted his attorney's statement. Chruby asserts that he wanted to testify he had never used the victim's credit card and had used her car only after he found it far from her home. Chruby complains that he decided not to testify only after trial counsel told him that he would get the needle if he took the stand.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court explained that the inquiry to be asked in assessing an ineffective assistance of counsel claim is whether "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.... [T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052. The troubling aspect of trial counsel's performance is that he delivered an opening statement after the close of the prosecution's case. At that point he had heard the evidence against his client and was in a good position to determine whether or not to call him to the stand. Moreover, if he was unsure at that point whether Chruby should testify, he probably should not have promised the jury that Chruby would take the stand in his defense.

Assuming that Chruby has shown that counsel's errors were "professionally unreasonable," *id.* at 691, 104 S.Ct. 2052, he nonetheless fails to show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. 2052. The Supreme Court teaches that a "reasonable probability" in this context "is a probability sufficient to undermine confidence in the outcome." *Id.* We therefore turn to the evidence presented by the Commonwealth during Chruby's criminal trial in order to ascertain whether, absent the errors asserted, there is a reasonable probability that the jury would not have convicted Chruby.

The Commonwealth presented a strong case against Chruby, which included evidence of the facts that follow. The day after their investigation of Fergus' homicide began, the police received clothing and some store tags and receipts all contained within an "American Outfitters" shopping bag that had been discovered by an employee of a trash pick-up service in a dumpster across town. All of the items appeared to be stained with blood. The district manager for American Outfitters reviewed the receipt, which showed that the clothing was paid for with the victim's credit card, which was missing from her wallet, and that the purchase had been made fifty minutes after the last time that anyone had heard from the victim. The clothing was sold to an individual matching Chruby's general description and placed in a shopping bag identical to the one found in the dumpster. The next day the police discovered that Chruby had been an inmate at the federal prison in Butner, North Carolina and that inmates at this facility were provided with green army-type belts identical to the one found in the

bag in the dumpster. The police investigation also revealed that a person matching Chruby's description had been taken to the Nittany Mall where items identical to other bloody clothing found in the dumpster were purchased. After the outfit matching the bloody dumpster ensemble was purchased, a taxi picked a man up at the mall and brought him to the motel where Chruby had been staying. The motel clerk remembered seeing Chruby return to his room that evening with a bag and also remembered seeing Chruby wearing a shirt identical to the bloody one found in the dumpster. According to motel records, a call was placed from Chruby's room to the victim's residence on September 1, 1995.

At trial it was also disclosed that Chruby and the victim had met in the spring of 1995, before Chruby went to prison. The victim and Chruby had met at a fundraiser dinner for the Centre County Women's Resource Center, where they were among six other guests. The victim realized that the topics of conversation were not of interest to Chruby so she directed his attention to something they had in common—Chruby's acquaintance with her son, Chuck. Chuck Fergus is an author who writes about hunting, nature, and the outdoors. Chruby met Chuck when Chruby was employed as a hunting guide at a hunting preserve in Centre County and the two hunted together. The police thought that Chruby may have formed the impression that the Fergus family was well off because Chuck Fergus was a well-known author and the victim was a prominent community activist.

The Commonwealth presented the evidence summarized above and other evidence at trial. Given the strength of the Commonwealth's case, we cannot conclude that, absent trial counsel's errors, the jury would have had a reasonable doubt as to Chruby's guilt.

### IV. Conclusion

After hearing oral arguments and carefully considering the arguments discussed above and all other arguments advanced by the petitioner in support of his assertion that the District Court erred in denying his petition for writ of habeas corpus, we affirm the District Court's decision.